# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **WESTERLUND LOG HANDLERS, LLC,** *et al.*, | Case No. 3:16-cv-922-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **MICHAEL J. ESLER,** *et al.*, | |
| Defendants. | |

Judy Danelle Snyder and Holly M. Lloyd, LAW OFFICES OF JUDY SNYDER, 1000 SW Broadway, Suite 2400, Portland, OR 97205. Of Attorneys for Plaintiffs.

Matthew J. Kalmanson, Gordon L. Welborn, and Jason R. Poss, HART WAGNER LLP, 1000 SW Broadway, 20th Floor, Portland, Oregon 97205. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiffs are Westerlund Log Handlers, LLC ("WLH") and David Westerlund ("Westerlund"), who owns 60 percent of WLH.[1] Defendants are Michael J. Esler ("Esler") and the law firm of Esler, Stephens & Buckley, LLP ("ESB").[2] Plaintiffs allege legal malpractice and breach of fiduciary duty. Before the Court is Defendants' motion for summary judgment. For the reasons that follow, Defendants' motion is granted in part and denied in part.

---

[1] Roger Nance ("Nance"), who owns 40 percent of WLH, initially joined WLH and Westerlund as a plaintiff. Nance has since voluntarily dismissed his personal claims.

[2] Plaintiffs also originally named Kim T. Buckley ("Buckley"), a partner at ESB, as a defendant. Plaintiffs have since voluntarily dismissed their claims against Buckley.

**STANDARDS**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

**BACKGROUND**

Westerlund and Nance formed WLH in 2009. In 2013, WLH was providing log handling services for China National Building Materials Import and Export Corporation ("CN"). In the spring of 2013, and again in November and December 2013, Nance and Westerlund met with Dennis J. Murphy, Sr. ("Murphy" or "Dennis Murphy") and other representatives of Murphy Overseas U.S.A. Timber and Land Development, LLC and Murphy Overseas U.S.A. Holdings, LLC (collectively, "the Murphy Group").[3] During these meetings, Nance and Westerlund discussed with the Murphy Group the possibility of working together.

---

[3] Murphy Overseas USA Astoria Forest Products, LLC ("AFP") was formed on January 17, 2014. For convenience, the Court also includes AFP in the group referred to as "the

In late December 2013,[4] Westerlund and Nance met with the Murphy Group at the office of the Murphy Group's accountant, Craig Vagt. Representatives of the Murphy Group who attended the late December meeting included Dennis Murphy and Ed Morrissey.[5] Esler also attended the late December meeting. At this meeting, the participants discussed and reviewed several documents relating to WLH's business operation and its contracts with CN. According to Plaintiffs, the late December meeting lasted three to four hours, during which time the Westerlund Parties and the Murphy Group agreed to form (or agreed to formalize) a joint venture in the future. The joint venture would involve the creation of a new company, ownership of which would be split between the Westerlund Parties and the Murphy Group. According to Plaintiffs, the Murphy Group would receive 70 percent ownership of the new company because it would be paying all legal costs and investing money in the new venture; the Westerlund Parties would receive a 30 percent ownership interest.

Before the late December meeting, Nance and Westerlund believed that WLH's log handling agreement with CN called for an exclusive relationship on the part of WLH. (The written contract between CN and WLH was one of the documents reviewed and discussed at the late December meeting.) Nance and Westerlund believed that they owed a duty to CN to "stick it out" during the duration of that agreement. According to Plaintiffs, however, Esler told Nance

---

Murphy Group." The members of the Murphy Group are defendants in the separate but related lawsuit of *Westerlund, et al. v. Murphy Overseas USA Astoria Forest Products LLC, et al.*, Case No. 3:15-cv-1296-SI (Lead) (D. Or.).

[4] The exact date of this meeting is disputed. Nance testified that the meeting took place on December 31. Westerlund testified that he thought it was December 29 or 30. Esler testified that he believed the meeting was on December 23. The specific date in December is not critical, and the Court refers to this meeting simply as the "late December meeting."

[5] Nance and Westerlund both testified that Dennis Murphy Jr. and Dave Daggett ("Daggett") also attended the late December meeting on behalf of the Murphy Group.

and Westerlund at the late December meeting that if the Murphy Group decided to do business with WLH, the Murphy Group could "coexist" with CN as a WLH customer. In other words, according to Plaintiffs, Esler told Nance and Westerlund that WLH could work with both CN and the Murphy Group. While Esler was out of the room, Morrissey reiterated to Nance "our lawyer thinks" that WLH's contract with CN is not exclusive.

Also at the late December meeting, Esler told Westerlund and Nance that the WLH agreement with CN was unfavorable to WLH and that before the Murphy Group and the Westerlund Parties could work together on a future joint venture, WLH needed to disentangle itself from its contract with CN. Westerlund testified that Esler looked over the CN agreement and said that Westerlund was "being cheated." According to Nance and Westerlund, they relied on statements by both Esler and Morrissey about how to terminate the agreement between WLH and CN. Indeed, according to Nance, he discussed with Esler the details of WLH's termination letter to CN. In addition, the Murphy Group's Ed Morrissey proofread WLH's termination letter before WLH sent it to CN.[6]

---

[6] Defendants dispute these facts. Esler testified that it was Nance who suggested sending a letter to CN terminating the contract with WLH. Esler added that he responded to Nance by stating: "I represent the Murphy group. We do not want to have you write a letter, we don't want to have any part of you terminating your relationship" with CN. On the other hand, Gordon Carey ("Carey"), who later represented the Westerlund Parties in the litigation between WLH and CN, testified that when he first spoke with Esler, Esler told Carey that Esler's client, the Murphy Group, was planning a joint venture with WLH, that WLH was in an unfavorable agreement with CN, and that before the joint venture could be formalized, WLH needed to get out from under its contract with CN. Also according to Carey, Esler told Carey that Esler believed CN had breached the agreement with WLH, that Esler had advised WLH to terminate its agreement with CN, and that WLH had done so. Carey also testified that Esler told him that Esler had helped write the letter of termination and that Esler told Carey that he had been speaking directly with Westerlund about the termination letter. Nance testified, however, that it was Nance who drafted WLH's letter terminating WLH's relationship with CN. When asked who at the Murphy Group proofread the termination letter before it was sent, Nance testified that Morrissey had done so. At this stage of the litigation, the Court must view the evidence in the light most favorable to Plaintiffs and draw all reasonable inferences in Plaintiffs' favor. A

At the late December meeting, Nance understood that Dennis Murphy was paying Esler to be at the meeting. In that meeting, Esler did not agree to represent WLH. While Esler was present, there was no discussion of who Esler or his law firm represented. Plaintiffs, however, testified that they believed that Esler was representing the interests of the future joint venture that was under discussion, while also orchestrating a plan to get WLH disentangled from CN in order to further that future partnership. According to Plaintiffs, Esler did not want a formal or written agreement regarding the joint venture prepared at this time because that might later be used by CN to support a claim that the Murphy Group had tortuously interfered with the business relationship between CN and WLH. Nance stated that he believed that Esler, whom Nance characterized as "Murphy's lawyer," was present to help get WLH "unhooked" from CN. Nance also believed that WLH could rely on Esler, who was representing the Murphy Group during these meetings, because as of the late December meeting, WLH and the Murphy Group were either partners or, at least, future partners. Westerlund stated that he had a similar belief, including that Esler was the Murphy Group's lawyer. At the late December meeting, Esler, however, did not expressly tell either Nance or Westerlund that Esler could not represent them.[7]

---

reasonable inference from all of this evidence, viewed in the light most favorable to Plaintiffs, is that Esler advised Nance and Westerlund about how to terminate WLH's agreement with CN and played some role in drafting that letter.

[7] The parties also dispute this fact. According to Esler, during a break at the late December meeting, Nance asked Esler whether he could represent WLH, and Esler expressly responded that he could not because he represented the Murphy Group, but he could help WLH locate an attorney. Esler understood that Nance was referring specifically to WLH's contractual relationship and impending dispute with CN when Nance asked whether Esler could represent WLH. Nance testified that Esler did not tell Nance at the late December meeting that Esler could not represent WLH, Westerlund, or Nance. Nance does not recall, however, whether at this particular meeting Esler told Nance that he would help WLH, Westerlund, and Nance find an attorney.

Approximately one week after the late December meeting, Esler told Morrissey to relay a message to Nance recommending attorney Mike Haglund ("Haglund") for the Westerlund Parties. Shortly thereafter, Haglund and Esler spoke by phone. Haglund told Esler that he had decided not to represent WLH, Westerlund, or Nance.

Between the late December meeting and January 13, 2014, Esler worked on drafting an agreement that ultimately became the written Log Handling Agreement ("LHA") between the Westerlund Parties and the Murphy Group. On January 8, 2014, Nance and Esler spoke by telephone. Esler sought further information that he needed for drafting the LHA. Esler asked Nance whether there was an operating agreement with CN, who was the lessor on the Port of Astoria lease, and who was the lessor on the lease with the Lewis & Clark Log Yard.

On January 13, 2014, the Westerlund Parties and the Murphy Group met at Esler's law office (ESB) to discuss the LHA. Esler attended the meeting for approximately 30 minutes. Before that, Esler had given the Murphy Group a draft of the LHA. At this meeting, Esler did not tell the Plaintiffs that he could not represent them.[8]

In addition, before the January 13 meeting, Esler had not provided any written notice to Nance or Westerlund that Esler did not represent them, or that Nance and Westerlund should

---

[8] The parties dispute whether, at the January 13 meeting, Esler stated that he could not represent WLH. Nance testified that Esler did not make any such statement. Viewing the facts in the light most favorable to Plaintiffs, the Court must assume at this stage of the litigation that Esler did not tell Plaintiffs at this meeting that he could not represent them. The parties also dispute whether Esler even spoke at all during this meeting. Esler testified that he began the meeting by stating that he did not represent the Westerlund group. Esler also testified that he walked the parties through the draft LHA and then left the meeting. Although Westerlund and Nance did not state unequivocally that Esler *did not* say this at the meeting, Nance testified that he did not recall any specific statements Esler made, and Westerlund testified that he did not recall Esler speaking at all during the meeting. When Westerlund was asked whether anything Esler said in his deposition about the meeting was untruthful, Westerlund noted that Esler had said that he went through the contract, but Westerlund did not recall Esler walking through the contract. Westerlund also testified that Esler was only present very briefly.

obtain their own counsel for the Westerlund Parties. According to Esler, at the January 13

meeting, Esler did not know whether the Westerlund Parties were represented by counsel.

The LHA was signed on January 13, 2014. A representative of AFP signed the LHA for

the Murphy Group.[9] Nance and Westerlund signed the agreement in their office in Astoria for the

Westerlund Parties.[10] At the time of the January 13 meeting at Esler's office, Westerlund

understood that Esler represented the Murphy Group, but Westerlund also thought that they,

including Esler, "were all working as a group." Westerlund did not ask Esler any questions about

the LHA. Nance testified that Esler did not "directly" advise him to sign the LHA, but Nance

believed that Esler was the "architect" who put together the whole deal, with the interests of the

joint venture (or future joint venture) in mind.

At some point in January—though not at the January 13 meeting—Nance asked Esler

whether Esler would be representing WLH in its dispute with CN. Esler told Nance that he

would not, but that he would "hire someone" to represent WLH in that matter. Westerlund

testified that representatives of the Murphy Group reassured Westerlund that "Esler was creating

a strategy to protect the company, Westerlund Log Handlers, while [it] was going through and

proving that [CN] had breached the contract." Westerlund never asked Esler or any other ESB

attorney about this strategy in December 2013 or January 2014. Westerlund testified, however,

that both Morrissey and Daggett from the Murphy Group consistently reassured him and urged

Westerlund to "trust Murphy." On January 15, 2014, WLH terminated its contract with CN.

---

[9] It was not until January 17, 2014, however, that documents forming Astoria Forest Products, LLC were filed with the Oregon Secretary of State. This issue, however, does not appear to be legally relevant.

[10] Westerlund initially expressed some confusion about where he signed the LHA, first stating that he was "led to believe" he signed it in Esler's office. Westerlund's recollection, however, was that he signed the LHA in WLH's office. This accords with Nance's recollection. This issue also is not legally relevant.

On approximately January 12, Esler spoke with Gordon Carey about representing WLH.[11] On January 12, Esler sent to Carey by email WLH documents that Nance had provided to the Murphy Group. Esler and Carey spoke on both January 17 and January 19. During these discussions, Esler told Carey about the joint venture plans between the Westerlund Parties and the Murphy Group, WLH's contract with CN, and the termination letter that WLH had sent to CN. Carey understood that the Westerlund Parties and the Murphy Group were proceeding in or toward a joint venture, but that they did not want to have a formal, written agreement that CN might be able to use against them. On January 19, Esler sent Carey by email copies of documents from Morrissey relating to WLH's agreement with CN. That email included communications between the Murphy Group's Morrissey and Esler about WLH's position with respect to CN. On January 19, Carey and Esler met in person. On January 20, both Esler and Craig Vagt, the accountant for the Murphy Group, forwarded to Carey more WLH-related documents. Carey and Esler also spoke by telephone that day.

On January 21, 2014, Carey met with Esler and representatives of both the Murphy Group and the Westerlund Parties. The meeting occurred at Esler's law office. During this meeting, the discussion addressed the details of a joint venture that was beyond anything covered in the LHA. It appeared to Carey that the parties already were working as partners. Carey believed that after the dispute between WLH and CN had been resolved, the Westerlund Parties and the Murphy Group would formalize their joint venture agreement. Before this meeting, Esler told Carey about Esler's views of potential damages that might be recovered by WLH in the CN litigation. Also on January 21, Karli Neilson, Westerlund's daughter (formerly Karli

---

[11] There is a dispute about the exact date when this conversation first occurred. Carey testified that his involvement with the case began on January 17. Esler testified, however, that he first met with Carey on January 11. Records reveal that on January 12, 2014, Esler sent an email to Carey, attaching copies of WLH-related documents.

Westerlund), sent an email to Esler containing a document titled, "Gordon_Meeting.docx." This document included notes discussing several aspects of the WLH-CN relationship. At this time, Neilson was not yet working for the Murphy Group; that began in late March, 2014. By January 27, both Nance and Westerlund had signed a retainer agreement with Carey.

On January 28, Nance, Westerlund, and WLH entered into a "common interest" agreement with AFP, allowing the parties to share otherwise privileged communications. Esler signed the agreement on behalf of AFP. The agreement took the form of a letter addressed to Carey as the attorney for the Westerlund Parties. The agreement stated that the two sets of parties had a common interest in preventing any possible litigation between WLH and CN from interfering with WLH's ability to perform under the LHA. The common interest agreement also provided that, in order to enable WLH to remain in business, AFP would advance payments to WLH under the LHA. The agreement further provided that each attorney would agree, to the extent one party had potentially privileged information, that such information would not be disclosed to any third parties without the written consent of the other party. On January 31, Carey filed a complaint against CN in Oregon state court in Clatsop County on behalf of WLH. Throughout the CN litigation, Carey worked closely with Esler and Buckley, under the common interest agreement.

In late January or early February 2014, Esler contacted Richard Miller about also representing WLH. As Plaintiffs understood it, Esler hired Miller to represent WLH as their business or transactional lawyer, while Carey would focus on the litigation with CN. As Miller understood it, the Murphy Group retained him to represent WLH. Esler told Miller that Esler represented the Murphy Group, that WLH would be Miller's client, and that the Murphy Group would be paying Miller's legal bills for work done for WLH. Miller understood that, despite the

fee structure, his professional duties ran to the Westerlund Parties. Miller believed that, at some

point, WLH would repay the Murphy Group for its payment of WLH's legal fees. Nance,

however, testified that he did not believe WLH would ever be required to repay the Murphy

Group for legal fees that it paid on behalf of WLH. Nance explained that he believed that the

payments made by the Murphy Group for WLH's legal expenses was part of the reason why the

Murphy Group would receive 70 percent of the future joint venture, while the Westerlund Parties

would receive only 30 percent. On February 17, Miller spoke with Carey about WLH. Although

Miller does not recall the conversation, Carey testified that he told Miller that the lawsuit over

the CN contract was filed so that both the Murphy Group and the Westerlund Parties would

become "free" from the limitation of WLH's contract with CN.

Miller first contacted the Westerlund Parties on February 18, 2014, after his discussions

with Esler and Carey. During Miller's conversation that day with Westerlund and Karli Neilson,

Westerlund explained to Miller that Murphy had promised Westerlund 30 percent of a future

joint venture and a "raise" for both Westerlund and Nance. After this discussion, Miller believed

that the Westerlund Parties and the Murphy Group would, at some point in the future, negotiate,

formalize, and sign a joint venture agreement. Between mid-February and at least the end of

April, 2014, Miller often worked on WLH matters and was in frequent contact with

representatives of WLH.

On February 20, 2014, Miller sent by email to both Neilson and Carey a draft "workout

proposal" that would allow WLH to continue working with both CN and AFP. The draft

agreement was between CN, WLH, and the Murphy Group. Miller told Carey and Neilson that

there was a plan separately to tell AFP that the Murphy Group would form a joint venture with

the Westerlund Parties for log purchases in the future. Neilson wrote to Miller and Carey, asking

Miller to call Morrissey to discuss one of the terms of the draft agreement. Miller responded that the draft was not supposed to be shown to Morrissey or Esler "yet." On February 24, Esler, Miller, and Carey jointly discussed the formation of a new corporation to be called "Westerlund Workout." After this discussion, Miller recounted parts of the conversation and told Neilson that Miller could not contact Morrissey without Esler's permission because Esler represented Morrissey. The parties did not ultimately enter into a workout agreement.

On February 28, Miller wrote to Esler, Morrissey, Neilson, and Carey: "Mike, I assume everything from here on out is based on oral promises? We're fine with that. Just kidding Mike. Do you want to leave loose until we see what the Chinese do?" Defendants characterize this as a tongue-in-cheek comment, referring to the fact that the future relationship between the parties was not yet in writing, and still needed to be negotiated.

On March 6, 2014, WLH and AFP entered into a Security Agreement and a Co-Tenancy Agreement. The Security Agreement gave AFP a security interest in several WLH assets. The Security Agreement identifies Esler and his law firm as attorneys for AFP, and Miller as the attorney for WLH. The Security Agreement was drafted by an attorney in Miller's law firm. The Co-Tenancy Agreement made AFP a co-tenant on WLH's port leases. The Co-Tenancy Agreement states that Esler represents the Murphy Group. Miller advised the Westerlund Parties on both of these agreements. After Miller discussed with Westerlund the Co-Tenancy Agreement, Westerlund told Miller that he trusted the Murphy Group.

At the end of March 2014, WLH defaulted on its lease at the Port of Astoria. In April, AFP took over the lease, in accordance with the terms of the Co-Tenancy Agreement. On March 31, 2014, Neilson sent by email to Esler and Morrissey a copy of a letter from the Port of Astoria, notifying WLH that WLH had defaulted on the Port lease. In her email, Neilson implied

that the Murphy Group's Daggett had instructed her to do so. On April 2, Neilson forwarded to Miller a copy of the Port's letter. Miller asked Neilson when the Port's letter was received and whether the invoice to the Port had been paid. Neilson responded: "As far as I was told it was strategy by AFP. If there is a default by WLH, they can take over the leases. The invoice was not paid." Miller asked Neilson who had told her that. She responded that Daggett had given her that direction and that she believed he had done so at the direction of Esler and Morrissey. Miller asked Esler why the Murphy Group had allowed the leases to default.

Miller and Carey soon arranged for a meeting with Esler to discuss the Port lease's default. At this point, Carey was concerned because there was nothing in writing guaranteeing that WLH would get the leases back from AFP. Carey expressed his concern to Westerlund, who told Carey that he trusted Dennis Murphy. Esler assured Carey and Miller not to worry, and Esler explained that AFP took over the leases only to protect those leases from CN, which might try to take control over them. Esler stepped out of the room so that Carey and Miller could speak with Westerlund by telephone. Westerlund reaffirmed his trust in Dennis Murphy. When Esler returned, Carey told Esler that Carey expected that the leases would return to WLH if something did not work out between the Westerlund Parties and the Murphy Group.

On April 27, Dennis Murphy, Tim Murphy, and Daggett came to WLH's offices in the Port of Astoria. According to Westerlund, Dennis Murphy told Westerlund that he wanted to retract the oral agreement that they had made. Murphy wanted to give Westerlund a job in the log yard with a $7,000 per month salary, rather than the $21,000 monthly salary to which the parties had previously agreed. At the end of this discussion, however, Murphy agreed that the original deal would govern. That night, Murphy called Westerlund late at night and left several voice mail messages on Westerlund's telephone stating that the deal was off. Westerlund soon

called this to Morrissey's attention, but Morrissey reassured Westerlund that the Murphy Group would honor the original oral agreement. Also in late April, Esler asked Miller to "calm" Westerlund and told Miller that Westerlund would not be getting 30 percent of the company because Murphy had invested "so much money." Miller concluded that Esler was simply "negotiating," and that the Murphy Group had not necessarily abandoned the terms of the previously discussed joint venture.

Throughout May 2014, the Westerlund Parties and the Murphy Group continued to work together, and Carey and Miller continued to work on the CN litigation, which had not yet been resolved. In July, Esler reviewed and provided comments on a draft mediation agreement. Mediation between the Westerlund Parties, the Murphy Group, and CN took place in July. In a declaration that the Westerlund Parties filed in Clatsop County Circuit Court in July, Carey stated: "Contrary to [CN's] statement in its motion, page 9, WLH, David Westerlund and Karli Westerlund are not acting '*in* concert' with AFP." During an August hearing related to the CN litigation, Westerlund testified that WHL gave CN a better log handling rate than it gave to the Murphy Group because WLH and CN were "partners." In November 2014, the Murphy Group paid $2.55 million to CN to settle all claims by and against CN, including claims asserted by CN against WLH. After the settlement agreement, WLH no longer owned any equipment or leases.

In the related *Murphy* litigation, Westerlund, Nance, and WLH sued the Murphy Group, alleging various claims relating to both the alleged oral partnership (or joint venture) agreement and the Log Handling Agreement. The Court recently granted in part the Murphy Group's motion for partial summary judgment. Trial in that case is set to begin on April 9, 2018.

## DISCUSSION

Plaintiffs allege legal malpractice and breach of fiduciary duty based on a lawyer-client relationship.[12] To prevail on a claim of legal malpractice, a plaintiff must show: "(1) a *duty* that runs from the defendant to the plaintiff; (2) a *breach* of that duty; (3) a resulting *harm* to the plaintiff measurable in damages; and (4) *causation, i.e.*, a causal link between the breach of duty and the harm." *Stevens v. Bispham*, 316 Or. 221, 227-28 (1993). To prevail on a claim for breach of fiduciary duty in the attorney-client context, a plaintiff "must plead and prove [a breach of the duty of loyalty, good faith, and fair dealing], and must show that the breach caused an identifiable loss or resulted in injury to the party." *Pereira v. Thompson*, 230 Or. App. 640, 654 (2009) (quoting *Lindland v. United Bus. Inv.'s*, 298 Or. 318, 327 (1984)).

Defendants move to dismiss Plaintiffs' claims on several grounds. First, Defendants argue that Plaintiffs cannot establish an attorney-client relationship, which forms the basis of both of Plaintiffs' claims. Defendants further argue that Plaintiffs' claims are time-barred; Plaintiffs cannot prove that their purported damages were caused by Defendants; Plaintiffs' claims are barred by the doctrine of *in pari delicto*; and Plaintiffs cannot establish an oral partnership agreement, on which they base their damages. Defendants also argue that WLH can no longer continue as a party in this litigation based on a position that Plaintiffs took in the related *Murphy* litigation. Finally, Defendants argue that certain deposition testimony from the *Murphy* litigation should be excluded from Plaintiffs' evidence in this case.

---

[12] Plaintiffs suggest in supplemental briefing submitted after oral argument that Defendants also may be liable to Plaintiffs under a breach of fiduciary duty theory for aiding tortious conduct on the part of the Murphy Group. This theory of liability, however, was not alleged in Plaintiffs' Complaint. Plaintiffs' breach of fiduciary duty claim is based solely on Defendants' own actions. Plaintiffs allege that Defendants represented them in the face of a non-waivable conflict of interest but acted solely for the benefit of the Murphy Group, rather than for Plaintiffs' benefit. The Court does not consider Plaintiffs' new theory of liability, which was asserted at this late stage of the litigation.

## A. WLH as a Party

Defendants argue that WLH cannot continue as a party in this litigation due to a position that the Westerlund Parties took in the related *Murphy* litigation. Plaintiffs do not offer a substantive response to this argument, but object on the grounds that Defendants raised this argument for the first time in their reply brief. Because the Court allowed supplemental briefing, and held oral argument, the Court will decide this argument on its merits.

In the *Murphy* litigation, the Westerlund Parties argued that the parol evidence rule should not bar their claims stemming from the alleged oral partnership agreement. In making this argument, the Westerlund Parties argued that the alleged oral partnership agreement did not "involve" WLH. They further argued that the integration clause in the LHA applied *only* to the relationship between WLH and AFP—not to Nance or Westerlund's relationship with AFP or other parties. Here, the Westerlund Parties argue that Defendants represented the unformed, the loosely formed, or the to-be-formed partnership. Defendants argue that if WLH was not a party to the alleged oral partnership agreement, WLH as an entity cannot assert claims against Defendants.

Under the equitable doctrine of judicial estoppel, "a litigant may not benefit by making directly contradictory arguments regarding the same dispute in different tribunals." *PowerAgent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1192 (9th Cir. 2004); *see also Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (noting that the doctrine is an equitable one). In deciding whether to apply judicial estoppel, courts may consider three factors: (1) whether "a party's later position [is] 'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Hamilton*, 230 F.3d at 782-83 (quoting *New Hampshire v. Maine*, 532 U.S. 742 (2001)). The Ninth Circuit "has restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position." *Hamilton*, 230 F.3d at 783 (citing *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir. 1998)).

It is not entirely clear which of Plaintiffs' purportedly contradictory arguments came first. WLH has been a party in this case since May 25, 2016. The Westerlund Parties asserted the argument that Defendants refer to in a brief filed on July 21, 2017. Regardless, in deciding the summary judgment motion in the *Murphy* litigation, the Court did not rely on the argument that WLH was not a party to the alleged joint venture. The Westerlund Parties' further argument— that the LHA's integration clause integrated the agreement only with respect to WLH and AFP— was addressed in the Court's analysis, but the Court did not agree with that argument. Thus, the Court declines to apply the equitable doctrine of judicial estoppel to bar WLH from continuing as a party in this legal malpractice lawsuit.

**B. Evidentiary Objections to Plaintiffs' Submitted Deposition Testimony**

Defendants object to Plaintiffs' use of deposition testimony from the *Murphy* litigation, arguing that it constitutes inadmissible hearsay. "An interview given under penalty of perjury may, however, be treated as a declaration—and therefore may be considered in ruling on a summary judgment motion." *S.E.C. v. Phan*, 500 F.3d 895, 913 (9th Cir. 2007). This is true even if "Rule 32(a) prevents its use as a formal deposition." *Id.*; *see also Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966-67 (9th Cir. 1981) (holding that depositions made on personal knowledge and setting forth facts that were admissible in evidence qualified as affidavits for summary judgment purposes). Defendants specifically object to the use of testimony by Nance and Westerlund from the *Murphy* litigation. Because the objected-to depositions were taken under

oath, the Court considers them for purposes of the pending summary judgment motion to the same extent that the Court would consider affidavits or declarations from Nance and Westerlund.

## C. Establishing an Attorney-Client Relationship

Plaintiffs' claims are based largely on their assertion that Defendants represented Plaintiffs in the formation of a partnership with the Murphy Group. "[A]n attorney ordinarily is not liable to those outside of the attorney-client relationship because there is no obligation to protect anyone outside of the attorney-client relationship from economic losses." *Lahn v. Vaisbort*, 276 Or. App. 468, 477 (2016) (quoting *Roberts v. Fearey,* 162 Or.App. 546, 550 (1999)). Thus, to recover in this case, Plaintiffs must show that they had an attorney-client relationship with Defendants. In their motion, Defendants argue that Plaintiffs cannot establish an attorney-client relationship.

There was no formal retainer agreement between Plaintiffs and Defendants in this case. Nonetheless, "[t]he existence of a lawyer-client relationship may be inferred from the circumstances and the conduct of the parties, and does not depend on a formal agreement." *In re Wittemyer*, 328 Or. 448, 456 (1999) (citing *In re Hassenstab,* 325 Or. 166, 172 (1997)). "[T]wo types of evidence may allow an inference that a lawyer-client relationship exists: '(1) the services performed were of the kind traditionally done professionally by lawyers, *i.e.*, legal work, and (2) the putative client intended that the relationship be created.'" *In re Conduct of Hassenstab*, 325 Or. 166, 172-73 (1997) (quoting *In re Weidner*, 310 Or. 757, 768 (1990)).

### 1. Performing Legal Work

An express attorney-client relationship may exist when "the services performed were of the kind traditionally done professionally by lawyers, *i.e.*, legal work." *Weidner*, 310 Or. at 768-69. There is evidence in this case that Esler provided legal work for Plaintiffs, at least early on in the parties' relationship. Esler told Plaintiffs that he did not think that WLH's

contract with CN required exclusivity. Esler also advised Plaintiffs to terminate their agreement with CN, and discussed with Plaintiffs how to go about doing so.

In *In re Bristow*, the Oregon Supreme Court found that a lawyer-client relationship existed on the basis of the performance of legal work. The first written communication between Bristow and the putative client, Wright, "recognized that the parties would be working together in protecting Wright's interests. The letter also provided Wright with various forms of legal advice, and set out the arrangements for the billing of attorney fees, costs and disbursements." *In re Bristow*, 301 Or. 194, 201-02 (1986). The court noted that the purported client and the lawyer "conferred from time to time, by letter and by telephone, regarding" the matter at issue. *Id.* at 202. The court noted that it had previously found, in *In re Galton*, that it did not matter whether the purported client also had other counsel. *Id.* at 202 (citing *Galton*, 289 Or. at 581).

In *Bristow*, the Oregon Supreme Court also discussed its decision in *In re Robertson*. In *Robertson*, a case involving a sale of real property, the court found a lawyer-client relationship existed between a lawyer and property sellers where the lawyer had represented the sellers for at least 15 years, including in other land sale contracts. Most importantly, however, "the accused was responsible for drafting the land sale contract and never told the sellers that he was not representing them in the particular transaction." *Bristow*, 301 Or. at 202. In both *Bristow* and *Robertson*, "the accused provided legal advice to both sides of the transaction and provided the legal documents necessary to" the transaction. *Bristow*, 301 Or. at 202. At no point, in either case, had the lawyer told the putative client that he was not representing the client. *Id.*

Plaintiffs have not put forward sufficient evidence to create a genuine dispute of fact on whether Esler created an express attorney-client relationship through the performance of legal

services. Esler's discussions with Plaintiffs do not rise to the level of the services performed in either *Robertson* or *Bristow*.

## 2. Putative Client's Intent

In *In re Weidner*, the Oregon Supreme Court stated the circumstances in which an attorney-client relationship may be established based on a putative client's objectively reasonable belief that the relationship existed:

> [T]o establish that the lawyer-client relationship exists based on reasonable expectation, a putative client's subjective, uncommunicated intention or expectation must be accompanied by evidence of objective facts on which a reasonable person would rely as supporting existence of that intent; by evidence placing the lawyer on notice that the putative client had that intent; by evidence that the lawyer shared the client's subjective intention to form the relationship; or by evidence that the lawyer acted in a way that would induce a reasonable person in the client's position to rely on the lawyer's professional advice. The evidence must show that the lawyer understood or should have understood that the relationship existed . . .

*Weidner*, 310 Or. at 770 (citations omitted); *see also Hassenstab*, 325 Or. at 173 (noting that this portion of *Weidner* specifically described the second type of evidence). A previous lawyer-client relationship between the parties may also "support the conclusion that such a relationship was intended during a subsequent contact." *Hassenstab*, 325 Or. at 173.

### a. Imputing Carey or Miller's Knowledge to Plaintiffs

Defendants argue that Carey and Miller's knowledge of who represented whom must be imputed to Plaintiffs. Plaintiffs respond that, while Carey and Miller may have known that Defendants represented only the Murphy Group in connection with the CN litigation, Plaintiffs claims relate to a separate matter—advice on the steps necessary to launch a joint venture with the Murphy Group.

"A relationship between an attorney and a client is one of agent and principal. And '[a]n agent's knowledge acquired within the scope of the agency is imputed to the principal, regardless of whether the agent actually communicates that knowledge to the principal.'" *Atkeson v. T & K Lands, LLC*, 258 Or. App. 373, 382 (2013) (internal citation omitted) (quoting *Benson v. State*, 196 Or. App. 211 (2004)). The Oregon Court of Appeals has previously cited to the Restatement (Third) of Agency § 5.03, which provides that "notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal," unless two exceptions which are not relevant here apply. *Atkeson*, 258 Or. App. at 382-83 (2013) (quoting Restatement (Third) of Agency § 5.03 (2006).

The Court agrees with Defendants that Carey and Miller's knowledge should be imputed to Plaintiffs. Both Carey and Miller testified to their understanding that they each represented the Westerlund Parties, and that Defendants represented the Murphy Group. Plaintiffs' attempts to limit the scope of Defendants' non-representation of Plaintiffs to the CN litigation do not change this result. Carey testified that he did not believe Esler represented Plaintiffs. He did not testify that he did not believe Esler represented Plaintiffs with respect to the CN litigation only. Under Oregon law, Carey's understanding will be imputed to his clients, Nance, Westerlund, and WLH. Thus, after Carey began representing Plaintiffs, Plaintiffs could not have had a subjective belief that Esler or ESB represented them.

Nonetheless, Plaintiffs were not represented by either Carey or Miller until January 27, 2014, when they signed a retainer agreement with Carey. Plaintiffs' lawyer-client relationship with Carey appears to have begun on January 21, 2014, when Carey attended a meeting with Plaintiffs at WLH's office. Thus, Carey's knowledge that Esler and ESB did not represent the Westerlund Parties cannot be imputed to Plaintiffs until January 21, 2014. This,

however, was after Plaintiffs terminated the CN contract, and after Plaintiffs signed the Log Handling Agreement. With regard to whether Plaintiffs have put forward enough evidence to create a genuine dispute of material fact on whether an attorney-client relationship existed between Plaintiffs and Defendants before Carey began representing Plaintiffs, the Court turns next to the Plaintiffs' subjective intent and to any objective evidence reasonably supporting that intent.

### b. Subjective Intent

Both Nance and Westerlund testified to their subjective belief and intent that Esler and ESB represented them in the formation of a joint venture with the Murphy Group. Each believed that Esler and ESB was orchestrating a plan to untangle WLH from CN for the benefit of the entire future partnership. Although Nance admits that Esler told him that Esler could not represent Plaintiffs, both Nance and Esler also acknowledge that when Nance asked Esler about representing them, Nance was referring specifically to Esler's ability to represent Plaintiffs in litigation with CN. There was no discussion of whether Esler and his firm could represent Plaintiffs in another matter, including forming the future joint venture.

Defendants argue that Plaintiffs have not put forward any objective evidence of Plaintiffs' subjective intent, such as a letter, memorandum, or email from the time of these events. But Defendants cite no authority for the proposition that such contemporaneous documentary evidence is necessary to establish a subjective intent. Nance and Westerlund stated in their deposition testimony that they believed Esler and his law firm was working for their benefit, as well as for the benefit of their future venture with the Murphy Group. This is sufficient to create a genuine dispute of fact on whether Plaintiffs had the subjective intent that Esler represent them.

### c. Objective Evidence

With regard to the signing of the LHA, Westerlund testified that Esler himself never advised Westerlund to sign it. Although Esler states that he went through the contract at the January 13 meeting, neither Nance nor Westerlund remembers Esler saying anything at all during that meeting. Although Westerlund testified that he and Nance "were told" that they could not yet have any written partnership agreement with the Murphy Group, and that they needed to present the appearance of an arms-length relationship, albeit deceptively toward CN, neither Nance nor Westerlund testified that Esler, himself, told them as much. Rather, Nance and Westerlund got this information from Daggett and Morrissey.

Plaintiffs have put forward evidence, however, that Esler advised Plaintiffs on their contractual relationship with CN. Further, Esler spoke directly with Nance when he drafted the LHA. Additionally, it was Esler himself who went about not only referring Plaintiffs to Miller and Carey, but actually reaching out to Miller and Carey, sending them documents related to WLH's business practice, and hiring them on behalf of Plaintiffs. Further, Esler's client, the Murphy Group, paid Carey and Miller's fees. There is a genuine dispute of fact as to whether Esler told Plaintiffs, either at the late December meeting or the January 13 meeting that he did not represent them. Although Esler told Nance at some point in January that he could not represent Plaintiffs, both Esler and Nance recognized that Esler was talking specifically about representing them in the CN litigation. Before Carey's involvement, Esler's conduct was of the sort that might induce a reasonable person in Plaintiffs' position to believe a lawyer-client relationship had existed.

Additionally, Esler should have understood that Plaintiffs were relying on his advice. Esler had direct contact with Plaintiffs during at least two in-person meetings and one telephone call with Nance. Nance and Westerlund testified that at the late December meeting, the parties

formed a plan eventually to form and operate a joint venture, and Esler's advice on the CN relationship contributed to a plan to move that future partnership forward. Carey also testified that Esler expressly relayed this plan to him. Additionally, Plaintiffs were not represented by any other counsel either when they terminated the CN agreement or when they signed the LHA, and according to Plaintiffs, Esler did not tell Nance or Westerlund that he did not represent them or that they should seek their own counsel.

Defendants note that Plaintiffs have frequently entered into business deals without their own representation, and Plaintiffs do not dispute this fact. There is no evidence, however, that Esler knew of this practice at the time, such that it would affect how Esler interpreted his own relationship with Plaintiffs. The Court concludes that there is a genuine dispute of material fact with respect to whether a lawyer-client relationship existed between Plaintiffs and Defendants before Carey began representing Plaintiffs.

**D. Causation**

Defendants argue that summary judgment is warranted for the additional and independent reason that Plaintiffs cannot prove causation. "[I]n order to prevail in a negligence action, a plaintiff must establish that *but for* the negligence of the defendant, the plaintiff would not have suffered the harm that is the subject of the claim." *Watson v. Meltzer*, 247 Or. App. 558, 565 (2011). In a legal malpractice claim, "a plaintiff must show . . . 'that the result would have been different except for [an attorney's] negligence.'" *Id.* at 565 (quoting *Harding v. Bell*, 265 Or. 202, 205 (1973)). In a claim for breach of fiduciary duty, a plaintiff must show that the breach "caused an identifiable loss or resulted in injury to the party." *Pereira*, 230 Or. App. at 654 (quoting *Lindland v. United Ins. Inv.'s*, 298 Or. 318, 327 (1984)).

Defendants argue first that Plaintiffs' claims are based on the fact that the Murphy Group did not abide by the alleged oral partnership agreement—not on any legal advice they received

from Defendants. Therefore, Defendants argue, Plaintiffs cannot show that the result would have been different but for Defendants' actions. Plaintiffs' claims, however, are based on more than the Murphy Group's failure to follow through on the alleged oral agreement to form a joint venture. Plaintiffs allege that Esler advised them about terminating their relationship with CN and then developed a plan that Plaintiffs relied upon in signing the LHA that ultimately led Plaintiffs to lose their port leases and other property and interests. To the extent that Plaintiffs acted in reasonable reliance on Defendants' advice before Carey began representing Plaintiffs, Plaintiffs may be able to prove damages caused by Defendants' actions.

Defendants further argue that, to the extent Plaintiffs' alleged harm is based on the CN termination letter, Plaintiffs cannot establish that a different result would have been reached had they not relied on Defendants' advice because WLH's relationship with CN was not affected by the termination letter. On January 17, 2014, two days after Nance sent CN the termination letter, CN wrote to WLH—not referencing the termination letter—outlining WLH's alleged breaches of the agreement between WLH and CN and demanding that WLH perform under the agreement. CN stated that if WLH did not pay CN what CN contended was due under the contract within 14 days, CN would "initiate proceedings to exercise one or more of [its] rights" against the Westerlund Parties. CN again wrote to Nance later that day, responding to the termination letter. CN rejected any right by WLH to terminate the agreement. It was Carey who later responded to CN on behalf of WLH. Carey reiterated that WLH terminated the agreement based on CN's alleged breach. Defendants characterize this letter as affirming the earlier termination letter and negating any argument that Plaintiffs were harmed by allegedly relying on Esler's earlier advice to send the termination letter. Plaintiffs respond by citing an expert opinion in the related *Murphy* litigation that the CN termination letter precipitated litigation with CN and made more

complicated the resolution of that litigation. According to Plaintiffs, litigation with CN might have been avoided altogether had the original termination letter not been sent.

Although Plaintiffs acknowledge that their damages may be uncertain at this point and likely depend upon the outcome of the related *Murphy* litigation, the Court cannot say, as a matter of law, that Plaintiffs cannot prove damages or causation. Thus, there remains a genuine dispute of fact with respect to what might have transpired had Plaintiffs taken a different approach with respect to CN. Further, in the *Murphy* litigation, this Court concluded that the Westerlund Parties may not introduce evidence of the alleged separate, oral agreement to prove their claims that rely on a breach of that alleged partnership agreement because doing so conflicts with the terms of the written Log Handling Agreement and is precluded by the parol evidence rule. Thus, to the extent that Plaintiffs relied on Esler and ESB in signing the LHA, Plaintiffs may be able to show causal damages. At the minimum, this issue present a genuine dispute of material fact. To the extent that Plaintiffs' damages relate to actions taken before Carey began representing Plaintiffs, therefore, Defendants' motion for summary judgment on causation is denied. The Court, however, may reconsider the question of damages and causation either at the pretrial conference in this case or during trial, on a motion for judgment as a matter of law, depending on the evidence presented about the state of the related *Murphy* lawsuit.

**E.  Statute of Limitations**

Defendants also argue that, even if Plaintiffs could establish the existence of an attorney-client relationship, Plaintiffs' claims are time-barred. Plaintiffs' claims arise under ORS § 12.110(1) and are subject to a two-year statute of limitations. ORS § 12.110(1). Plaintiffs filed their claim on May 25, 2016. Thus, if Plaintiffs' claims accrued before May 25, 2014, they are time-barred.

Oregon's "discovery rule," however, governs the timeliness of Plaintiffs' claims of legal malpractice and breach of fiduciary duty. *Cole v. Sunnyside Marketplace, LLC*, 212 Or. App. 509 (2007) (explaining that the discovery rule generally applies to actions under § 12.110). "[T]he discovery rule does not require *actual* discovery or knowledge of the claim but, instead, imputes to the plaintiff the level of knowledge that an exercise of reasonable care would have disclosed." *Johnson v. Multnomah Cty. Dep't of Cmty. Justice*, 344 Or. 111, 118 (2008). The statutory time period begins to run when "a plaintiff knows or, in the exercise of reasonable care should know, that he or she has been injured and that there is a substantial possibility that the injury was caused by an identified person's tortious conduct." *Id.* "For purposes of determining what facts a plaintiff knows or should have known, 'the discovery rule applies an objective standard—how a reasonable person of ordinary prudence would have acted in the same or a similar situation.'" *Padrick v. Lyons*, 277 Or. App. 455, 466, review denied, 360 Or. 26 (2016) (quoting *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or. 270, 278 (2011)). Plaintiffs must "act diligently to discover the relevant facts." *Id.* "Whether a plaintiff has discovered an injury generally presents a factual question for the jury, but the question is susceptible to judgment as a matter of law if 'the only conclusion a reasonable jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter.'" *Padrick*, 277 Or. App. at 466 (quoting *T.R. v. Boy Scouts of America*, 344 Or. 282, 296 (2008)).

At issue in this case is when Plaintiffs "knew of or should have known facts that would make a reasonable person aware of the substantial possibility that [Plaintiffs] had suffered financial loss as a result of defendants' tortious conduct." *Id.* Defendants characterize Plaintiffs' claim only as a failure to disclose that Defendants were representing the interests of the Murphy Group. Defendants argue that, because Carey and Miller both knew that Defendants did not

represent Plaintiffs when they began their representation, then as soon as January 2014, when Carey began representing Plaintiffs, Carey's knowledge was imputed to Plaintiffs, and Plaintiffs knew that Defendants did not represent them. Defendants argue in the alternative that Plaintiffs should have known of their claims by late April 2014—the point at which Murphy and Westerlund had a disagreement about the future relationship between the parties, and Carey stated that Miller would negotiate on behalf of Plaintiffs and Esler would be negotiating on behalf of Murphy.

Plaintiffs argue that it was not until late July 2014, that Westerlund and Nance first began to suspect that Defendants were not representing their interests in the alleged future partnership. Before then, Plaintiffs—as well as Carey and Miller—believed that both groups were working together to resolve the CN matter in order to allow the Westerlund Parties and the Murphy Group to move forward as partners. Plaintiffs point out that Carey and Esler exchanged information and worked together as late as July of 2014, evidencing a relationship that remained cooperative. Plaintiffs argue that it only became clear at the mediation held in July 2014 that there would not be a joint venture.

Even if Plaintiffs knew, by imputation, that Defendants did not represent their interests as of January 2014, that is not sufficient to establish that they knew or should have known that they had a cause of action against Defendants. That question requires examining not just when Plaintiffs knew that Defendants were not, in fact, representing Plaintiffs' interests, but also when they knew that their reliance on Defendants' advice had tortiously caused harm to Plaintiffs. This, in turn, depends on when Plaintiffs knew or should have known that the Murphy Group were not going to follow through on the joint venture plans, and that Plaintiffs' earlier reliance on Defendants compromised their position with respect to the Murphy Group.

The Court cannot say that the only reasonable conclusion a jury could reach is that Plaintiffs knew of these facts before May of 2014, two years before Plaintiffs filed their claims. Although there was some tension between the parties in April, when Murphy suggested to Westerlund that he might not go through with the partnership, Plaintiffs were reassured by Daggett and Morrissey that there was nothing to worry about. Miller was also told by Esler at the end of April that Westerlund would not be getting 30 percent of the future company, but Miller concluded that Esler was merely trying to renegotiate with him—not necessarily end the partnership plans permanently. In May, the parties continued working together on the CN litigation. Thus, Defendants are not entitled to summary judgment on the grounds that Plaintiffs' claims are time-barred.

## F. The Defense of *In Pari Delicto*

Defendants further argue that Plaintiffs' claims are barred by the doctrine of *in pari delicto* ("in equal fault"). *See McKinley v. Weidner*, 73 Or. App. 396, 400 (1985). "The doctrine of *in pari delicto* may—but not need—be applied to prevent recovery in a law action, when the party against whom it is to be applied is as culpable as, or more culpable than, his opponent." *Id.* at 401. The relevant question is whether, on the record before the court, "it could be established that plaintiff was equally culpable with, or more culpable than, defendant." *Id.* at 401.

To establish Plaintiffs' culpability, Defendants note that Plaintiffs claim to have entered into a secret agreement with the Murphy Group to defraud CN and that Plaintiffs then sought, in litigation in Clatsop County Circuit Court, to deceive CN and the state court. Defendants note that Westerlund testified in state court that WLH gave CN a cheaper rate on its services than it gave to the Murphy Group because WLH and CN were "partners," implying that WLH and the Murphy Group were not partners. Defendants also point to the fact that Carey testified in the state court litigation that Westerlund was not acting "in concert" with AFP.

Defendants rely on *Kirkland v. Mannis*, 55 Or. App. 613 (1982). In *Kirkland*, a criminal defendant and his lawyer developed a false story for the defendant to tell at his trial. The former defendant was charged with perjury, and later sued his former lawyer for malpractice. The court found that the plaintiff could not recover against the lawyer because of his "unclean hands."[13]

Regarding Plaintiffs entering into the LHA in an effort to maintain the false appearance of an arms-length transaction, it is not entirely clear that this constituted "fraud" on CN, that Plaintiffs understood or should have understood as much, or that Defendants were not in a better position to appreciate that fact than Plaintiffs. Esler told the Westerlund Parties that their contract with CN was not exclusive and that WLH could work with the Murphy Group as well as with CN. Plaintiffs were told that the Murphy Group did not want a formal written agreement until after WLH was no longer in any relationship with CN and had resolved its dispute with CN because CN could have sued the Murphy Group for tortious interference with contractual relations. There is no evidence, however, that Plaintiffs knew whether CN actually had or would assert such a claim—only that the Murphy Group wanted to avoid anything that might encourage CN to assert such a claim or support such a claim if asserted. Defendants have not established that this conduct constituted the sort of knowing and obvious wrongful conduct that would prevent Plaintiffs from recovering against Defendants. At the minimum, the evidence raises a genuine issue of fact.

Similarly, Westerlund's comment that WLH gave CN a lower price than Murphy had under the LHA does not rise to the level of culpability found to bar recovery in *Kirkland*. It was true that under the LHA itself, WLH and AFP were not partners. Finally, in context, it is not

---

[13] In *McKinley*, the Oregon Court of Appeals noted that *Kirkland's* reference to the doctrine of "unclean hands" was incorrect and should have been to the doctrine of *in pari delicto*, but added that *Kirkland* was "right in substance." *McKinley v. Weidner*, 73 Or. App. 396, 399-400 (1985).

clear that Carey's statement to the court that WLH and AFP were not acting "in concert" constituted fraud on the state court. Carey testified that David Westerlund and Karli Neilson were not acting in concert with AFP, but explained that Neilson was actually an employee of AFP. His comments were also specifically addressed to the issue of whether Westerlund or Neilson had assisted in moving logs from a particular pier to the airport. Moreover, it was not Plaintiffs themselves who made this comment. Although Carey acted as Plaintiffs' agent at the time that he made those comments, Defendants have not established that any allegedly incorrect statement made by Carey must be imputed to Plaintiffs as fraudulently made. The Court declines to find that the doctrine of *in pari delicto* prevents Plaintiffs from recovering in this case as a matter of law.

## G. The Parol Evidence Rule

Both Plaintiffs and Defendants incorporate by reference the parties' arguments in the related *Murphy* lawsuit about the parol evidence rule. In that litigation, the Murphy Group argued that the Westerlund Parties could not rely on evidence of an oral partnership agreement that contradicted the terms of the Log Handling Agreement to recover on breach of the partnership agreement. In that case, this Court agreed.

In this case, however, Plaintiffs do not allege breach of the oral partnership agreement. Rather, Plaintiffs allege that they relied on Defendants' legal advice to their detriment. Plaintiffs' claims do not depend on the existence of an oral partnership agreement. Instead, Plaintiffs' claims rely on Plaintiffs' evidence of Esler's advice regarding WLH's termination of its agreement with CN and WLH's decision to sign the LHA. Plaintiffs introduced evidence of the oral partnership agreement to explain their reliance on Esler's advice. Because their claims do not depend, however, on whether the alleged oral partnership agreement exists or is enforceable, Plaintiffs' claims are not barred by the parol evidence rule.

**CONCLUSION**

Defendants' motion for summary judgment (ECF 52) is GRANTED IN PART and DENIED IN PART. Defendants' motion is granted with respect to any claims arising out of Defendants' actions after Gordon Carey began representing Plaintiffs. There are genuine disputes of fact, however, regarding: (1) precisely when Carey began representing Plaintiffs; (2) whether Plaintiffs were in an attorney-client relationship with, or were otherwise owed fiduciary duties by, Defendants *before* Mr. Carey began representing Plaintiffs; (3) whether Defendants breached any duties owed to Plaintiffs; and (4) whether Defendants' breach caused Plaintiffs' damages.

**IT IS SO ORDERED**.

DATED this 29th day of January, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge